All right. Hear ye, hear ye, hear ye. This Honorable Appellate Court in the 2nd District is back in session. Pursuant to adjournment, the Honorable Catherine E. Zenos presides. Thank you. Please be seated. Your Honors, the first case of the afternoon is called 214-009. Victor Township Drainage District 1 v. Lundeen Family Farm Partnership for All. On behalf of the Outlaw, Mr. Daniel J. Kramer. On behalf of the athletes, Mr. Kevin Buck. Excuse me, Kevin Mueller. Sorry, Kevin. And John Hunter. Thank you. Mr. Kramer. Thank you. Good afternoon, Justices, members of the audience, and Council of Record. Your Honors, this case comes before the Court today, as you know, on a drainage issue, a drainage district issue. We've alleged four grounds that we believe were applicable in terms of reversing the judgment of the trial court after a second trial. First trial was held in this case that Judge Klein ruled in favor of the defendants, and he did it on an equitable basis and ruled against Plaintiff prohibiting the connection and provided that the defendants should pay a proportionate share of cost for both hookup and annual maintenance for the drainage district ditch. A post-trial motion was filed by the Plaintiff in the case asking for a new trial, and it's clear the law has always been in Illinois that there's three basis on which a trial court can grant an order for a new trial. The first being that there's a change in the law, which was not platter argued in this case. The second being that there was a substantial change or new facts discovered that were not available to the parties seeking the new trial upon diligent inquiry, and the trial Judge Klein found that that was not the case. And the third one, which I've always found the most difficult being a practicing attorney for approximately 40 years, is arguing to the Court that there was a misapplication of the law. Didn't Judge Klein basically say, I misapplied the law? Actually, he said, maybe I pushed, his exact words were, maybe I have been attempting to impose an improper remedy in an effect to force a compromise among the parties. The maybe is, I think, not a true finding that there was a misapplication of the law. The fact that... Can I just stop you there and ask you a point of question? Sure, go ahead, Mr. Justice. Do you cite any authority for the proposition that the trial court is required to make specific findings before it grants a new trial? We have a case law... They are not required to make specific findings. But if they don't, then the review is de novo by you as appellate court, as opposed to abuse of discretion. Well, we don't have any bystanders reports, do we, in this record? We do. We have a bystander report from Judge Klein's decision. It was filed supplementally by the appellate in this case. Okay. And so the exact language is there. And I think that's important because you get a fresh de novo look at it as opposed to abuse of discretion. There's nothing in the case law that has been cited by appellate on injunctions where they say that you can't apply a stop-hold or waiver to a governmental body. There's nothing in any of those cases saying you throw out equitable principles. In other words, when someone asks for an injunction, they're asking that trial court for extraordinary, not ordinary relief. And all those principles that we cite in the injunction section of our appellate's brief on page 29 and so on deal with equitable powers, that one who's asking for equity has to do equity. One has to come in with clean hands. One can't sit by, and there are drainage cases on injunctive relief for drainage ditches, and watch the work being done. You're not at the starting gate, Mr. Kramer. Don't worry about it. Thank you, Judge. After heart surgery, I don't think I could. And, again, you can't sit by and watch the work being done. In this case, it was quite clear that the three members of the drainage district, who's the plaintiff in the case, Victor, knew the work was going on. But he only testified about the backhoe. Somebody testified about it. They only saw a backhoe, right? That may have been either Ron Frieders or Norm Johnson, or it could have been their attorney, Dale Stockley. Well, could the court have believed that, that they didn't know about it? I don't believe so, Judge. And the reason I say that is because the uncontroverted testimony of Dean Mundine was all three commissioners came out to the site on two different occasions, parked by the road and watched him work, and didn't talk to him. And, even more importantly, when the work was first starting, one trustee got a hold of Mr. Dean Mundine and asked him to attend a Victor Township drainage meeting. He went to the meeting, and they were very helpful. They didn't have a plaque book there, and one trustee even went home and got a plaque book to bring back. He showed them exactly the work that was going to be done, and they didn't say, well, don't do any more work until we authorize it, or stop this work. Nothing was done by Victor Township drainage district commissioners until they filed the lawsuit in September, after all the work was substantially done, but for one item. And that one item was they sent a letter out through their attorney in August of 2011. They sent it to a gentleman named Donald Mundine at an In the Village of Samanak Street address. And, again, the uncontroverted testimony at trial was Donald Mundine was the father of the people who owned the property, who are all adults. But he was never an owner of the property. He was never entitled. And he never passed this letter on to his son? He didn't. Frankly, ma'am, he was a 90-year-old invalid with 24-7 nursing care at home. And that's correct. The letter never got passed on in August. Let me ask you this question. Sure, Justice. Much has been said about Union IV being a necessary party. So before we even get to the facts and talk about this case, how do we get around that? That Union should have been a party? I think they should have, Your Honor. But the property wasn't in Union IV. It was actually in Union I, correct? Actually, this area that we're talking about was not in Union I. It was kind of in a no-man's land in between. Union I and IV generally ran to the east. And where this depressional area was turned out to not be in either of any of the three drainage districts, I should say. So you dispute that it was in Victor's drainage district at all? It was not in Victor's. We don't stand here and try and sell that to you at all. That's absolutely a fact. Was it in a dual district? Well, it's a dual district on the ditch at the north end of the Lundeen property and where Victor and Union IV join. Union IV has a ditch that runs generally northeast to southwest and is not very pronounced. It looks more like a grass waterway. It connects with Victor's drainage district directly. And under the drainage code, it's proper to have a connected ditch. But wouldn't you need court approval, though, in a dual district? Not necessarily court approval, again, for the fact that part of the Lundeen property was brought into the second district. That did need court approval. But to connect the two ditches, no. That's under the code that it's permissible for two drainage districts to have a connected ditch. Where this particular tile in question outlets would be at Union IV and then immediately west of that connection starts the Victor ditch. But they touch. They connect. So the water, if it were permitted to be drained by this tile, would go to the Victor ditch. There's no question about it. Let me ask you sort of a mundane question. Did Mr. Dean or Dean Lundeen ever seek approval by the district to start this work? Well, at this meeting, yes. When they already started, right? He had. And they asked him why. And as his testimony showed in the record, he believed the Lundeen property was actually in the Victor ditch or the drainage district, which turned out not to be the case. And the reason he believed that is years ago when Victor did the expansion of its drainage district, they sent notices to the property owners based on tax parcel number. The entire parcel number for the Lundeen family farm was contained in that. The actual map that was approved did not take in by legal description all the property. So when he went to that Victor meeting, he fully believed he was in their district, showed them what he wanted to do, and said, hey, I've been taxed on this. I'm part of it. And again, no one ever got back until after the work was done when the lawsuit was filed and said, hey, your property is not actually in it. But that's where I believe the good husbandry rule applies. At page 146, right at the end of Templeton v. Huss, where the Illinois Supreme Court has created the good husbandry exception, they literally say that you may cross watersheds. So the fact that the property is not in the district does not disallow them from draining land that is used and can only be used for productive agricultural purposes by draining it. Doesn't it need to be the dominant parcel? You would have to find that, correct. But here, the court found it was not the dominant parcel in its manifest way of the evidence, isn't it? It is. And of course, that's why we're here, because we disagree with the court's finding. Very respectfully, Judge McGadams, who primarily did criminal work during his practicing career, really made himself a student of law and worked hard on this case. So there's no disrespect intended. But the area we're talking about here never drained to the east to Union. It was a depressional area in the middle of a field that had a two- to three-foot rim around it, and the only way the water left was through evaporation of the air or soaking into the ground over a long period, which Mr. Dean Lundeen testified prevented it from being farmed, basically over the course of his 53 years of living on that farm. The good husbandry rule under Templeton says if there's a way to make unproductive land usable purely for farm purposes, no other purposes, you can discharge water in an amount that allows that productive agricultural use. Again, Judge Klein's ruling did say, well, okay, you can do that under the good husbandry rule, and you don't have to pay. You get to do it, but you've got to pay your way. Doesn't the good husbandry rule also require that you have to have a natural course of drainage? I believe not. In this case? I believe not. And the reason I say that is, again, it's tucked in right at the end. On Templeton. On page 146 of Templeton v. Huss, where they talk about crossing watersheds. And that's what made Templeton v. Huss so revolutionary. The civil rule coming down from the mid-centuries in England was, just as Your Honor has said, it's a dominant tenant discharging water to a servient tenant. Somebody's got to make the decision of what's dominant and servient. Well, let's assume you get over that hurdle. Okay. But isn't there also, again, the issue of which direction it's draining in? I am not. Trotter found that the drainage was not to the west. What disputes that? The testimony of Thomas Huddleston and the testimony of Dean Lundeen, that it was non-directional because it was a sunken bowl. It didn't go west. It didn't go east. But Tom Huddleston, whose whole career from teenage years on, and he's the Kane County advisor on drainage issues for their zoning department, based it on Discharge Point. The bottom of the ditch on the Union Drainage District to the northeast is at a 730 elevation. The bottom of this bowl, this depressional bowl that was being used to, the tile line to discharge from, was 730. The bottom of the ditch on Victor is 720 to 721. And he testified that two or three times at the trial, which meant there's nine feet of fall and water flows downhill. It wouldn't flow to the east even was there not the two-foot rim around the circular area. But it certainly wouldn't go up over the two-foot rim and flow east or west, Judge. It would have to go by, again, evaporation or soaking into the ground over long periods. There's some testimony, though, that the drain tile would have caused additional flooding on the adjacent property. Well, it's an interesting allegation in the sense that the only testimony that the affilee presented at trial was two of its commissioners saying every third to fifth year they currently have flooding on their property long before this tile was ever put in. And frankly, this tile's never been connected, so it hasn't added anything yet. But would it result in increased flooding? Can't tell you. Depends on how much rain you get and how the ditch is maintained. But that wouldn't be a legitimate consideration, would it? Absolutely. I agree. So you're saying you have to wait until the flooding happens to know? I think you would to see what the rainfall is and how the ditch is, in fact, maintained, Your Honor. So the damage has to be done first? Not always. If they can show some certainty, but they show no evidence whatsoever. In fact, the testimony of Norm Wesson as one of the commissioners of Victor was the real problem in our drainage ditch was caused by DeKalb County went for a downstream township at the Leland Road. They put in a bridge and they put a whole lot of broken up concrete and riprap in front of it, and it acts as a dam backing up our water. They have testified that this Lundin is going to cause problems or how much it's going to cause. And engineers can calculate those sort of things. They can calculate how many gallons per minute in 100-year rain, a 5.25-inch rain in 24 hours, which is a 100-year event, how much is going to be discharged by acreage. None of that was done here. Frankly, the only testimony we have of causation is this Leland Road bridge. I take it that really is my time to stop. We have one question. Can I ask you to address your equitable estoppel argument? Sure. Again, in Blackwater law, I agree that the proposition is that generally governmental bodies are not subject to estoppel or waiver unless they do a positive act. Here, we think they did three positive acts. They requested Dean Lundin to come to a meeting. He freely went, told them everything they were doing, said the union drainage district had approved the work. And, again, he's never hidden the fact that his family paid for this particular line because the other owners in the district said the other work you're doing cleaning up is fine. This one benefits your family. You pay for it. The second thing they did was come out to the property twice, look at it, and do nothing after seeing him or his contractor doing the work. And the third thing they did, again, was the letter that was sent to somebody that, in a small farming community, you knew this 90-year-old man who lived in town was not the party involved. He's not one of the partners. None of the mail went to him. And they knew where Dean was to go see him at the farm, to make contact, to come to their meeting. So I'm not saying there was malice, that they intentionally tried to dupe him into something. But the fact is they knew where he was and they could have got a hold of him before the work was completed. So are you saying that these acts induced reliance? Absolutely. Absolutely, Your Honor. Okay. Thank you, Justices. All right, you'll have time after the final. Appreciate it. Thank you. Good afternoon, Your Honors. My name is Kevin Buick, and I'm here on behalf of Victor Township Drainage District No. 1. I'm asking the Court's permission to divide my 15 minutes evenly with my colleague, Mr. Countryman, with the intention that I would be discussing the trial court's order. Mr. Countryman primarily will be orienting his remarks toward responding to Mr. Kramer's points in his brief. That's fine. Thank you. So my job here is to defend Judge McAdams' decision, which is a 25-page decision that was very thoroughly researched and we believe is really the polestar to guide this Court in its inquiry as to resolving this appeal. In this matter, Your Honors, the trial court took the time to listen to the testimony, took the time to visit the site, took the time to draw a map carefully, setting out the boundaries that are in this somewhat confusing patchwork of land here, and studied the applicable law very carefully. All of the meaningful answers to the Defendant's Counsel's points are contained within those 25 pages, and we urge this Court to study it and to affirm that decision. Let me stop you and ask you to start where we left off with Mr. Kramer with equitable estoppel, the fact that they asked this gentleman to come to a meeting, they discussed what he wanted to do, they came by the property a couple of times, saw them out there laying this tile, and they served the wrong person or gave the wrong person the letter in a town that I would assume is not huge, where they know all of the people involved. How do you respond to the equitable estoppel argument that your opponent raises? Well, Mr. Kramer did very correctly say that estoppel can only be applied against a municipal entity if there is an affirmative action taken by the municipality. And here I use the word municipality to describe a drainage district in Justice Shustick. You're absolutely right. It is not. There's not even a town. It's a loose collection of agricultural area there. But the testimony that Mr. Lundeen gave, that the trial court highlighted in its opinion, made it clear that he was working on the tile installation by the time that he had his first meeting with the commissioners, which I believe took place on September 6, 2011. What the trial court found, emphatically and unequivocally, is that the defendants never proved their burden to, never met their burden, rather, to prove that an affirmative act actually took place on the part of the... Does it have to be an affirmative act, or does the Doctrine actually encompass a non-action? In my opinion, Your Honor, it does have to be an affirmative act, and that's very critical when it comes to municipal entities and municipal bodies. By way of analogy, the reason I believe that this position exists is municipalities often are subject to the possibility that their purported non-action could be held against it as a defense. I practice in municipal law, and we see it commonly where in a property maintenance situation, for example, there may be a delay between the time that a municipality acts, and sometimes the property owner will claim that they detrimentally relied on that and that they don't have to clean up their property. Here in this situation, what's very clear and what the trial court did focus on is the fact that there are court proceedings and there are court procedures that are a part of any of these types of actions that involve drainage districts, and here there was no affirmative action that was taken whatsoever with regard to permitting this. So you're saying that if the commissioners came out, and it could be established, actually observed this and were on notice based on conversations with Mr. Lundin and their review of the property, if they knew that he was doing this work and they didn't do anything, that would not be sufficient to create a stop-all? What I'm saying are two things. One is that under those circumstances, yes, it would not be sufficient to create a stop-all, and two, in this situation, based on the record, it would not matter because the backhoe had already been observed out there, the work had already commenced, and I believe Mr. Lundin's testimony ultimately was that by the time he had that meeting with them, most, I'm trying to recall the exact feet, it may have been hundreds of 2,000-foot, was already completed. The problem in this circumstance is that it's our belief that Mr. Lundin felt that asking for forgiveness was better than asking for permission in this circumstance, and that's what abrogates the estoppel act, as the trial court found. So with respect to that, the trial court was addressing the injunction and went through and identified the clearly ascertainable right that the drainage district had because acting through its commissioners, those commissioners have an obligation under Section 414 of the Drainage Code to protect their property, and here, that was the ditch and the downstream owners. Mr. Lundin's intrusion with the water that he brought through his tile that was sunk 10-foot into the ground and running under Graham Road and across the watershed line, it did implicate that right, as the trial court found. The trial court found that there was no adequate remedy at law because, as the trial court pointed out, that remedy has to be clear, complete, and as practicable as possible and efficient to the ends of the prompt administration of justice as possible. Here, that was entirely appropriate to adjoin this and the ultimate decision that the court made served that end. And finally, the trial court found irreparable harm would occur and did occur if the injunctive relief would not be granted because what the trial court focused on was that the plaintiff would be subject to the transgressions of a continuing and ongoing nature such that no meaningful regress could be had. What the trial court found was that there was a substantial incursion in this instance, and that was based on Mr. Frieder's testimony and Mr. Wesson's testimony regarding not only the flooding but also the erosion and the additional water that this put into the ditch. What can happen, Your Honors, is that overflow of the ditch, even one that's as well-maintained as Victor's, and I might digress for a moment to discuss Mr. Huddleston's testimony. Mr. Huddleston found that the depressional area would best be cleared by running this tile into Victor's ditch simply because it was well-maintained, and he was focusing on the practicality of the maintenance. But here, what can happen is putting too much water can cause overflow, can move valuable topsoil into the ditch. Some areas with soap was in the testimony that was received, and the yield, I mean where the corn would get wet, would be diminished. So if that happens, then you're saying preempts the application of the good husbandry rule? Well, what the good husbandry rule gets to, Your Honor, is that it does acknowledge that a dominant tract, which, by the way, the court did find this was not a dominant tract, can increase or alter the water, but the right isn't unlimited. And what they look at very carefully in all of the lines of cases is the language from the Huddleston case that Mr. Kramer didn't quote, which, if my very rusty Latin is correct, is secutere tuo alienum non laus, which essentially says use your land in such a manner as to not injure another's. That, and the trial court found the injury. The trial court found that the good husbandry exception was not appropriate, both because Mr. Lundeen's tract was not dominant to the Victor ditch, but also because of the general course of natural drainage. It flowed to the northeast and not to the west. Crossing the watersheds, Your Honor, is an important thing. I agree with Mr. Kramer's contention that Huddleston, or excuse me, that Templeton v. Huss did provide some basis to say that good husbandry is appropriate application. But, again, thank you, the issue is that it is not unlimited. You know, I'm still struggling a bit. We're going back to the act of global estoppel here. And I know that a mere non-act by a government is certainly not enough to invoke the equitable estoppel. But in this case, as you said, they had already laid some of this tile by the time this occurred. Did anybody ever tell him, hey, hold on, stop, because we're not clear what we're going to do yet? When Mr. Stockley went to the defendant's house, did he ever say, hey, hold on, let's stop doing what you're doing? The record does have, yes, is the answer. The record does have a substantiation. Mr. Stockley testified at trial that he verbally told Mr. Lundin asked at that point if he could annex to the Victor district. Mr. Stockley said verbally, no, you're denied. When he went to his house? Yes, yes, that's what the record would show. But, you know, once again, from that perspective, I think the most important thing is that the act of the municipality must be affirmative. And here, while there is a passive understanding, I mean, Mr. Lundin's testimony repeatedly was, well, nobody told me. I think that's belied by the course of events that would be revealed in the trial court's opinion and in the record. I'll yield the balance of my time to Mr. Countryman. Thank you. Mr. Countryman heard that horse thing and he came out of the gate. He came out of the starting gate a few minutes earlier. Well, I'm not used to being here. May it please the Court. My name is John W. Countryman. I live in DeKalb and I have an office in Sycamore, Illinois. I am here to respond to Mr. Kramer, but I want to take up the issue that you just discussed. I tried this case in the trial court, and I read last night to my wife, Sher Grimm, the transcript in full. And the testimony of Mr. Stockley was that he went to Mr. Lundin's house and he told Mr. Lundin, at his kitchen table, that the land would not be annexed. Now, that is after the September 6th, which they described, I think, both Mr. Lundin and the plaintiffs, the first time that the two commissioners showed up because one of the other landowners called them and told them that something was going on out there that might affect them. So they went out to explore what would affect them. Then after that, there was a request by Mr. Lundin to annex the property to the Victor Drainage District. And they had these meetings. Now, to say that he asked Mr. Lundin to come to the meeting, they were acting upon his request. His request. Now, there was a comment in there somewhere by Mr. Lundin that there was a letter, but they never produced it, saying that they want to annex to the district. So that was what the request was. The suit for injunction was filed on September 30th, 2011. September 6th to September 30th, and in the meantime, they dealt with this request where they had to give notice under the Open Meetings Act and all those other things so that they could have these meetings to determine whether they were going to annex them or not, and they decided not to. That's not an unreasonable time. And so just on that time alone, I don't think there's a stopper. And I agree with everything Mr. Buick has said about an affirmative act. The cross-examination of Mr. Lundin, I was repentant with asking Mr. Lundin, did they ever send you a notice telling you not to do it? That's not an affirmative act. That's in the negative. Well, look, wait a minute. The sending of the notice is an affirmative act. The content is, what are we looking at? The sending of the notice or are we looking at the content? The notice was a denial of his request to annex to the district. So I don't think that was an affirmative act by the part of the district. It was a response to what their duty is under the law to act upon it. And, you know, nobody disputed that it went to the wrong Lundin. Okay? That happens in life. But the fact is Mr. Stockley testified clearly as the first witness that he went to Mr. Lundin's house on Graham Road, sat with Mr. Lundin at his kitchen table and told him it was denied. That's actual notice. At what point? I don't know that they were clear on the date, but was it well after the September 6th date? Well after that. And they had this session where somebody, I think it was Mr. Wesson, came back to his home to get the plan book so that they could all look at the plan book. I mean, they took serious consideration to this. This wasn't just we're not going to do it. Well, you know, Mr. Kramer talks about, you know, the positive acts or the acts that his client perceived to be basically the go-ahead or in essence not a no to laying this tile, the meeting, requiring to go to the meetings, the coming by the property a couple times, serving the wrong individual. The County of DuPage case, the first K-5, states there must be some positive acts. How are those not positive acts? Well, I think they're carrying out their duties. They're commissioners of a drainage district that runs seven and a half miles and covers 7,500 acres of land. Their duty was somebody was about to connect on to their district, and they had to determine whether they did so properly, rightly, or whether they were doing so illegally and make a determination. They took their attorney with them. And how much time did it take them to make this determination? Well, you know, September 6th to September 30th were the dates that were testified to. I believe the testimony was the first date they were out there was sometime in September, was September 6th, and that was two commissioners because one was gone. And then they did allow him the opportunity to say, I want to be annexed. But if you read my cross-examination of Mr. Lundeen, he's very unclear on that, very unclear. He didn't give clear testimony whatsoever that he had been led astray by the actions of the commissioners. And it's your position that going out there and seeing a backhoe didn't give? Well, he didn't give notice he was going to dig a tile, and they didn't know where it was going to go. He never submitted plans. There's testimony from Mr. Frieders that they asked for plans, and they never got any plans. So the record reflects that they didn't know what was happening when they saw the backhoe? That's right. And they didn't ask? Well, I think they did ask. I think Mr. Stockley asked what he was doing. But where he was connecting, he went 10 feet under Graham Road. He connected it under Graham Road and went across to the other 80 acres on the other side of the road and ran it down to where a portion of the land is in the Victor Drainage District. So they knew what he was doing at that point? Well, they didn't know he was going to go under Graham Road because he didn't furnish him any plans. They didn't ask? Well, I don't think they had any conversations between Mr. Lundin. All of them testified they didn't have any conversations really amongst themselves. I think there might have been some hard feelings. I don't know. I wasn't there. But it was a very friendly atmosphere. But Mr. Stockley knew both of them, and he was the attorney for the district, and he talked to Mr. Lundin. In any event, substantial work had already been commenced, correct? Before they ever saw it. Before they ever saw it. Tobacco was in there. They were digging. Before they ever saw it. The first time they observed it, it had started. That's my question, Mr. Countryman. The first time that they observed it, it had started, but they kind of let him go on and continue this work without saying, don't do anything more or stop. Well, I think Mr. Buick said it. Do you let him go ahead without asking for permission? The drainage code says you petition the court to annex your land to the drainage district. I understand that, but in the meantime, when there is no guidance given to this gentleman, he's laying how many miles of tile and incurring how many thousands of dollars expenses. Wouldn't it have been more equitable, if you will, for them to say, hey, I don't know what you're doing, but I think you better hold off until we give you permission or until we find out what's going on here. I would think when the commissioner showed up with their attorney, you ought to think that yourself. Well, did the attorney and the commissioner tell him that day when they showed up, do not proceed any further? Well, they didn't know exactly where he was going because he didn't furnish any plans. They asked him for plans. And I don't think you can back up on the first trial. You can't take the first trial and put it on this trial. There's evidence in the first trial that was never in the second trial, but there may have been some evidence as to what was said and what was done in the first trial. You can't bring that in the second trial because that's not up for you to review. The only issue for you to review there is whether Judge Klein, and I disagree with Mr. Kramer on this, Judge Klein, I supplemented the record. Judge Klein looked at me and said, Mr. Countryman, I misapplied the law. I agree with you on your third point. Thank you. All right. Thank you very much. Thank you, Your Honor. Mr. Kramer, obviously they agree with everything you've said. Obviously. I think one thing that's very clear in this case from, or should be from the court's point of view, is whether there's hard feelings or not, I can't tell you. But you're dealing with good, solid citizens on both sides here. I don't think anybody tried to intentionally do something wrong. But to say that Mr. Lundin just went out and made the decision and asked for forgiveness instead of asking permission ahead of time just isn't true. The record does show in both trials that Mr. Lundin was formerly a trustee or commissioner for the Victortown Drainage District and did not run again several years ago. He currently is a trustee for the Union Drainage District No. 4, so he knows what a drainage district is. Is he a lawyer? No. But he understands the responsibilities. And he was asked, the record is very clear, to come to that September 6th meeting. He wasn't the one that requested it. But being asked to go to the meeting wasn't permission to proceed. No. The meeting they talked about whether he would be able to proceed. Correct. Correct, Justice. And did he ever file anything within the courts to ask for permission to proceed? He did not. And, again, his impression, he believed from the prior tax notice, that his property was in Victor. Literally the first time he understood or knew that he was not in Victor was when Mr. Shockley explained to him that, yeah, it may have been your entire tax parcel number, but the map we ended up adopting didn't take in your entire property. The map was at variance with the notice they gave for the parcel numbers. Were there any gaps of language communicated at any time to Mr. Lundeen that would indicate, yeah, go ahead and do this, this is okay? In a positive sense, no. And that's what Judge Klein, he used the term, I'm not as a country lawyer clever enough to know what a colloquial play was, but that's what he found in his recitation, which you have the transcript from the first trial. He said, look, you as a district invited Mr. Lundeen to the meeting. He showed you on his platenet, which is part of the record, of what he was going to do and where. Did he have formal plans from an engineer? No. But he showed him what he was going to do. And then he went out and did it. And you came out twice. You sat by the road in your trucks. You didn't talk to him out there. And then the kicker is several weeks later, an open meetings act notices are only 72 hours. They're not a week or two weeks. They're 72 hours. Several weeks later, Mr. Stockley, who knows where he lives, comes to the family farm, sits down at the kitchen table, and does he say, stop working. Don't finish it because we're not annexing you. He simply says, well, they're not going to annex you. That word no means no. And if somebody had said that up front, that would tell you. If they're telling him they're not going to annex him, why would he continue to work? Why would he keep working? Frankly, at that point, I still think he has the right to, again, under the Templeton v. Huss, the exception to. Right. And again, if you look at all the reported cases that have come down the last ten years, most of the drainage cases were rampant because of the development in northern Illinois, where it was a developer or a commercial or a subdivision trying to discharge water either onto a farmer or a drainage district, one or the other. The ones you get downstate that were brought are almost universally not developer ones, but where a landowner said, I either don't want to pay anything or I don't like the amount they're assessing or what the drainage district is doing. There isn't any other cases other than Templeton v. Huss that deal strictly with the good husbandry rule, the right to use it for agricultural purposes. And I submit that even if it's not a part of the drainage district, the good husbandry rule applies here and allows him to discharge, but he's got to pay his fair share. But are you saying he's aware, he was aware of the good husbandry rule and that's why he proceeded at that time? In a practical sense, not in a legal sense, no, but in the practical sense, and it wasn't because the ditch was better maintained, it was because it was the only way to get fall. He knew that from the contractor, that the bottom of that depressed area was 730 and the bottom of the ditch at Victor was 721, and he knew the ditch the other way was flat. It was 730 plus he had to go up over the berm, the two feet. So you're saying regardless of whose district it's in, if it's something that you could apply to the good husbandry rule, then you don't need to petition any court in order to be able to do that? I think you can, correct, I agree with that proposition. But like Mr. Country, or excuse me, I believe that was Mr. Buick said, not unlimited, just to the amount necessary and it doesn't excuse you from paying your share. Thank you, Justices. Thank you very much, Counsel. The court will take this matter under advisement and render a decision in due course. We stand in recess until the next case. Thank you.